IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02451-PAB-MJW

TONYA DUNLAP,

      Plaintiff,

v.

SPEC PRO, INC., a foreign corporation,

      Defendant.

---

**ORDER**

---

      This matter is before the Court on the Motion for Summary Judgment [Docket No. 21] filed by defendant Spec Pro, Inc.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND

      Spec Pro is a corporation that contracts with the United States government to provide mail services to Peterson Air Force Base in Colorado Springs, Colorado.  Plaintiff Tonya Dunlap worked for Spec Pro as a postal service clerk from June 25, 2005 until her termination on May 1, 2009.  As a postal service clerk, Ms. Dunlap's duties included processing and distributing incoming and outgoing mail and packages.

      When Spec Pro hires a new employee, it gives him or her a copy of its Employment Manual Policies and Procedures ("employee handbook").  Docket No. 21-1 at 2, ¶ 8; Docket Nos. 21-3, 21-4.  Ms. Dunlap testified that she received and read a copy of the employee handbook when she began working for Spec Pro.  Docket No. 21-

2 at 4-5 (Dunlap Dep. 33:21-25, 34:15-17).  The employee handbook identifies, among other things, several policies that employees may utilize to notify Spec Pro of work related problems.  One such policy is the "Issue Resolution Policy."  Docket No. 21-3 at 22 (SPEC 00038).  The Issue Resolution Policy recommends that an employee first contact his or her program manager to raise any work related problem.  *Id.*  If the program manager is part of the problem, then the policy recommends that the employee seek advice from a director or the Department of Human Resources ("HR").  *Id.*; *see also id*. at 23 (SPEC 00039).

In addition to the issue resolution policy, the employee handbook has a policy about "Harassment, Including Sexual Harassment."  Docket No. 21-5 at 10-11 (SPEC 00086-00087).  The harassment policy provides specific examples of conduct constituting sexual harassment as it is defined by the Equal Employment Opportunity Commission ("EEOC").  *Id*. at 10 (SPEC 00086).  The harassment policy prohibits all forms of harassment and states that Spec Pro will investigate allegations of harassment as well as take immediate disciplinary action against any employee found to have harassed a co-worker.  *Id*.  In addition, the harassment policy states that all complaints are kept reasonably confidential and reporting employees will not be subject to reprisal.  *Id*.  The harassment policy identifies the following persons to whom a complaint can be made: an employee's immediate supervisor; the next higher level of management; the program manager or director; and the President/Chief Operating Officer ("CEO").

The sexual harassment policy states that complaints of harassment will be handled through the company's "Open Door Policy."  *Id*. at 11 (SPEC 00087).  The

Open Door Policy states that the "employee is required to first seek assistance from his Program Manager." *Id*. at 12 (SPEC 00088).   The policy notes that, if an employee's complaint involves his supervisor, the employee should discuss the matter with the Program Manager or Director, or may request an "independent discussion" with management outside the employee's area.  *Id*.  An employee may also request that an independent observer be present at a meeting with any level of management.  *Id*.   If an employee is not satisfied with the outcome of a complaint, the Open Door Policy allows the employee to appeal to a higher level of management.  *Id*. at 13 (SPEC 00089).

In August 2005, shortly after she began working for Spec Pro, Ms. Dunlap alerted Jim Weis and Robert DeYoung, two of her supervisors, that a co-worker by the name of Jason had touched her inappropriately.  Docket No. 21-2 at 7-8 (Dunlap Dep. 39:22-40:4).  Spec Pro investigated her complaint and terminated Jason's employment. *Id*. at 12-13 (Dunlap Dep. 44:21-24, 45:16-19).  Ms. Dunlap testified that Spec Pro's investigation took approximately two weeks from reporting to conclusion.  *Id*.

Ms. Dunlap said that, immediately after Jason's termination, she was not subject to any form of sexual harassment.  However, approximately three weeks after Jason's termination, the sexual harassment started up again.  Ms. Dunlap testified that she was harassed by Mr. DeYoung, Mr. Weis, Mike Burkey, Al Garcia, and Dave Bidishi.[1]  Ms. Dunlap said that Mr. DeYoung repeatedly asked her to sleep with him over the course of four years, Docket No. 34-1 at 12 (Dunlap Dep. 47:16-18), and Mr. Weis commented

---

[1]Dave Bidishi passed away sometime after the events giving rise to this litigation. Docket No. 34-1 at 18 (Dunlap Dep. 16:3-4).

about her breasts and said that she could not drive a work truck because she was a female.  *Id*. at 13 (Dunlap Dep. 49:15-19).

Ms. Dunlap said that Mr. Burkey sent her inappropriate text messages and emails, which included comments about Ms. Dunlap's sexual orientation.  *Id*. at 15 (Dunlap Dep. 65:11-14).  Mr. Garcia, on the other hand, commented about Ms. Dunlap's weight and made misogynistic statements such as, she needed to sweep and mop the office floor because that was "women's work."  *Id*. at 14 (Dunlap Dep. 61:18-22, 62:6-10); *id*. at 18 (Dunlap Dep. 16:13-22).  As for Mr. Bidishi, Ms. Dunlap claims that he would call her a "fucking bitch," walk in the bathroom when Ms. Dunlap was using it, "grab [her] ass, and think it was funny," and repeatedly told her that he wanted to sleep with her.  *Id*. at 14 (Dunlap Dep. 64:12-21).  Furthermore, Ms. Dunlap testified that the men at the company traded sexual jokes, had graphic discussions about their sexual liaisons, and rated women passing by the company based on their "fuckability." *Id*. at 15 (Dunlap Dep. 65:25-66:8).  Ms. Dunlap said that this conduct was "almost an everyday occurrence."  *Id*. at 14 (Dunlap Dep. 64:20-21).

Ms. Dunlap testified that she reported these events to several Spec Pro employees.  First, she told Mary Christine Vargas about Mr. DeYoung's sexual harassment.[2]  *Id*. at 12 (Dunlap Dep. 47:21-25).  At the time, Ms. Vargas was the Administrative Manager.  Docket No. 21-6 at 1.  Ms. Dunlap also testified that she

---

[2]Ms. Vargas testified that Ms. Dunlap first told her of sexual harassment during a phone call on April 8, 2009.  Docket No. 21-6 at 2, ¶¶ 6-7.

discussed the sexual harassment with Debbie Carrick, an employee at Glacier Technologies, one of Spec Pro's sister companies.[3]  Docket No. 21-1 at 4, ¶ 24.

In addition, Ms. Dunlap claims that she told Scott Albertson, a Spec Pro program manager, about the sexual harassment between 2006 and 2008.  Ms. Dunlap testified that, sometime in 2006, she spoke with Mr. Albertson over the phone about the sexual harassment.  Docket No. 34-1 at 13 (Dunlap Dep. 49:20-25).  During this conversation, Mr. Albertson had Ms. Dunlap on speaker phone even though Mr. Weis was in Mr. Albertson's office.  *Id.*  She also testified that, sometime in 2007, she spoke with Mr. Albertson about the harassment in the presence of Don Patterson and Regina Clayton, two of her co-workers.  Docket No. 21-2 at 19 (Dunlap Dep. 58:19-22).  Ms. Dunlap states that she raised the issue of sexual harassment with Mr. Albertson again in October 2008.  Docket No. 34-1 at 5 (Dunlap Dep. 74:11-14 (amended deposition testimony)).  Ms. Dunlap claims that she had a book in which she kept track of the sexual harassment incidents, but that she gave this book to Mr. Albertson because he told her he would investigate her claims.  *Id.* at 16 (Dunlap Dep. 48:5-8).  Mr. Albertson denies ever receiving such a book from Ms. Dunlap.  Docket No. 35-2 at 1.  Ms. Dunlap states that, despite all of her complaints to Mr. Albertson, Spec Pro took no corrective action to prevent or correct the harassing conduct.

Ms. Dunlap did not complain about the sexual harassment to a program manager other than Mr. Albertson and did not report the incidents to a Spec Pro director or CEO.  Docket No. 21-2 at 23 (Dunlap Dep. 77:5-14).  In addition, Ms. Dunlap

---

[3]Ms. Carrick is responsible for quality control and quality assurance issues and is not a program manager, director, or an executive.  Docket No. 21-1 at 4, ¶ 24.

did not request a meeting with a manager from an area outside of her division. *Id*. at 24 (Dunlap Dep. 78:1-10).

On December 3, 2008, Ms. Dunlap was injured in a non work-related car accident. Docket No. 21-2 at 25 (Dunlap Dep. 79:10-19). As a result of the car accident, she sustained injuries and had to take extended leave from work. *Id*. Spec Pro maintains an insurance policy that provides employees with short-term and long-term disability benefits. Docket No. 21-1 at 5-12. Spec Pro's short-term benefits allow an employee to take up to twelve weeks of job-protected leave. *Id*. at 2, ¶ 12. An employee may also qualify for long-term disability benefits, but taking long-term disability benefits results in an employee being placed on "inactive" status. *Id*. at 3, ¶ 17. An employee may return to active status once he or she is no longer on long-term disability benefits, but must re-apply for an available position. *Id*.; Docket No. 21-5 at 2 (SPEC 00078).

After her car accident, Ms. Dunlap took short-term disability leave between December 3, 2008 and March 3, 2009. Docket No. 21-1 at 2, ¶ 12. Once Ms. Dunlap exhausted the twelve weeks available under Spec Pro's short-term disability policy, Spec Pro allowed her to take a leave of absence beginning on March 3, 2009. *See* Docket No. 21-5 at 2-3. On April 2, 2009, Ms. Dunlap presented Spec Pro with a release from her doctor, which enabled her to return to work on April 13, 2009 with a two month 10-pound lifting restriction. Docket No. 21-5 at 22; Docket No. 21-2 at 26 (Dunlap Dep. 138:17-22). To perform the essential duties of a postal service clerk, an employee must have the ability to lift and carry between 70 and 75 pounds. Docket No.

21-2 at 24-25 (Dunlap Dep. 78:25-79:9); Docket No. 21-1 at 2, ¶ 7.  On April 8, 2009, Ms. Dunlap called Ms. Vargas and told her that she was concerned about losing her job because of the 10-pound lifting restriction.  Docket No. 21-6 at 1, ¶ 4.  Ms. Vargas told Ms. Dunlap that her employment status was dependent on the terms of the work release.  *Id*. at ¶ 5.  During this phone conversation, Ms. Dunlap also raised allegations of sexual harassment she experienced on the job.  *Id*. at 2, ¶¶ 6-7.

On April 10, 2009, Spec Pro sent Ms. Dunlap a letter informing her that, because of her doctor's restrictions, she could not perform the essential functions of her position.  Docket No. 21-5 at 23.  The letter indicated that she would be eligible for long-term disability.  *Id*.  On May 1, 2009, Spec Pro changed Ms. Dunlap's status to inactive long-term disability retroactive to March 3, 2009.  Docket No. 21-1 at 3, ¶¶ 16, 18.  Ms. Dunlap received long-term disability benefits from March 3, 2009 until June 10, 2010.  *Id*. at ¶ 22.  On May 28, 2009, Spec Pro sent Ms. Dunlap a letter advising her that, once her restrictions were removed, she could re-apply to the company assuming she qualified for an available position.  Docket No. 21-5 at 24; Docket No. 21-2 at 29 (Docket No. 142:21-24).  Ms. Dunlap, however, did not re-apply.  Docket No. 21-3 at 4 (Dunlap Dep. 147:15-17).

As a result of Ms. Dunlap's April 2009 allegations of sexual harassment, Spec Pro sent an investigative team to Peterson Air Force Base.  Docket No. 21-6 at 2, ¶ 8.  Spec Pro's investigative team found that employees and managers at Peterson Air Force Base, including Ms. Dunlap, used inappropriate sexual language.  *Id*.  Following the investigation, Mr. Weis and Mr. DeYoung received letters of reprimand.  Docket No. 21-1 at 4, ¶ 25; Docket No. 21-6 at 2, ¶ 9.  In addition, on June 10, 2009, Jim Oakes,

7

director of HR, conducted sexual harassment training for Spec Pro employees and managers at Peterson Air Force Base.  Docket No. 21-1 at 1, ¶¶ 4-5.

Ms. Dunlap filed a charge of discrimination with the Colorado Civil Rights Division and the EEOC.  Docket No. 1 at 2, ¶ 9.  On June 22, 2011, Ms. Dunlap received a Notice of Right to Sue from the EEOC.  *Id.*  On September 16, 2011, she filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e alleging (1) discrimination on the basis of sex, (2) retaliation for participating in protected activity, and (3) reckless and wanton gender discrimination in violation of 42 U.S.C. § 1981a.  Docket No. 1 at 2-3.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

8

## III. ANALYSIS

### A. Hostile Work Environment

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).[4] Sexual harassment that is sufficiently serious qualifies as unlawful sex discrimination under Title VII. *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Ms. Dunlap can establish a claim of a hostile work environment based on unlawful sex discrimination by showing (1) that she was discriminated against because of her sex, and (2) that the discrimination was sufficiently severe or pervasive so as to alter her conditions of employment. *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). To establish a hostile work environment claim, Ms. Dunlap must show that the environment was both "objectively and subjectively hostile or abusive." *Id*. (citation omitted).

Ms. Dunlap identifies multiple incidents to show that she was discriminated against because of her sex. For example, Mr. Weis discussed her weight, breasts, and said that she could not drive the work truck because of her gender. *Id*. at 13 (Dunlap Dep. 49:15-19). Mr. DeYoung propositioned Ms. Dunlap for sex throughout the course of her four year employment at the company. *Id*. at 12 (Dunlap Dep. 47:16-18). Mr. Garcia made several comments about her need to "clean" and "mop" the office because

---

[4]Spec Pro argues that Ms. Dunlap raises claims based on her sexual orientation, which are not actionable under Title VII. Docket No. 21 at 9-10. Although some of Ms. Dunlap's testimony may relate to comments by her co-workers about her sexual orientation, Docket No. 21-3 at 8-10, the Court finds that the majority of her allegations are related to sexual harassment based on her sex.

this constituted "women's work."  Docket No. 34-1 at 14 (Dunlap Dep. 62:5-10); *id*. at 18

(Dunlap Dep. 16:13-17).  Based on this evidence, the Court finds that Ms. Dunlap has

sufficiently shown that the sexually oriented comments directed at her occurred

primarily because of her sex.  *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th

Cir. 2012) (to state a prima facie case, plaintiff must show that she was "targeted for

harassment" because of her sex).

     To establish that her work place was hostile, Ms. Dunlap must provide evidence

showing that the workplace was "permeated with discriminatory intimidation, ridicule,

and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her]

employment and create an abusive working environment."  *Herrera v. Lufkin Indus.,*

*Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  To satisfy this prong, Ms. Dunlap presents

evidence that her male co-workers and supervisors routinely engaged in conduct that

was degrading to women.  She states that her male co-workers and supervisors rated

women based on their "fuckability," Docket No. 34-1 at 15 (Dunlap Dep. 65:25), sent

sexually explicit emails, *id*. (Dunlap Dep. 66:13-15), referred to female customers as

"bitches and whores," *id*. at 17 (Dunlap Dep. 157:1-6), and traded sexual jokes,

fantasies, and pictures in her presence on a daily basis.  Docket No. 21-3 at 6 (Dunlap

Dep. 160:1-9).  In addition, Ms. Dunlap testified that the sexual harassment was

sometimes physical as Mr. Bidishi would "grab [her] ass" and try to enter the bathroom

while she was using it.  Docket No. 34-1 at 14 (Dunlap Dep. 64:18-20).  Based on this

evidence, the Court finds that Ms. Dunlap has presented sufficient evidence to show

that she was subject to objectively severe harassment because the complained of

conduct was humiliating, degrading, and sometimes physically threatening. *Bertsch*, 684 F.3d at 1028.  Moreover, Ms. Dunlap established that the harassment was pervasive because she claims that it was directed towards her every day. *Id*.  Although Ms. Dunlap does not state with particularity on which dates the harassment occurred, the Court finds that her testimony about its frequency is sufficient to raise a triable issue of fact about whether her co-workers' conduct created an objectively hostile work environment. *Id.*

With regard to the subjective element, there is evidence that Ms. Dunlap participated in some of the sexual jokes with her co-workers.  Docket No. 21-3 at 5-6 (Dunlap Dep. 157:19-160:5).  However, the record shows that Ms. Dunlap objected to her co-workers' sexually explicit pictures, commentary, and unwanted touching.  In addition, Ms. Dunlap's subjective repulsion to her co-workers' conduct is further evidenced by the fact that she raised three separate complaints with Mr. Albertson. Considering Ms. Dunlap's description of the offensive conduct to which she was exposed and her complaints about her co-workers' behavior, it is not unreasonable she believed that her co-workers' conduct made her job more difficult. *Bertsch*, 684 F.3d at 1028.  Moreover, although there is no evidence about her work performance, Ms. Dunlap is not required "to show that the discriminatorily abusive work environment seriously affected her psychological well-being or that it tangibly impaired her work performance." *Morris*, 666 F.3d at 665 (citation omitted).

Accordingly, the Court finds that Ms. Dunlap has provided enough evidence to raise a triable issue of fact as to whether the behavior of her co-workers created a sexually hostile work environment that interfered with her work performance.  The Court

next addresses whether Ms. Dunlap can hold Spec Pro liable for the sexually harassing conduct of its employees.

### B.   Employer Liability

The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The Court, however, held that employers may be liable for the conduct of their employees under two theories: (1) negligence and (2) vicarious liability.  *Helm v. Kan.*, 656 F.3d 1277, 1285 (10th Cir. 2011).

Under the negligence theory, an employer is liable only "if it knew or should have known" about the sexually harassing conduct of a non-supervisory employee and failed to stop it.  *Ellerth*, 524 U.S. at 759; *Bertsch*, 684 F.3d at 1027.  By contrast, where the harassment is attributed to a supervisor with immediate authority over the employee, an employer is shielded from vicarious liability if the supervisor's sexual harassment does not culminate in a tangible employment action and the employer can prove the two-prongs of what is known as the *Faragher/Ellerth* defense.  *Ellerth*, 524 U.S. at 765; *Helm,* 656 F.3d at 1285.  Ms. Dunlap does not specify under which theory she brings her claim.  Because her claim involves both non-supervisory and supervisory co-workers, the Court will address both theories of liability.

#### 1.   Negligence Liability

As noted above, an employer can be liable for a non-supervisory employee's harassing conduct if the employer "knew or should have known about the conduct and

failed to stop it." *Bertsch*, 684 F.3d at 1027. To prove this liability, Ms. Dunlap must establish that (1) the employer had actual knowledge or constructive knowledge of the harassment and (2) the employer's remedial and preventative responses to the harassment were inadequate. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

With regard to the first element, actual knowledge is established where the plaintiff has reported harassment to a management-level employee. *Adler*, 144 F.3d at 673. Constructive knowledge may be inferred when the harassment is "highly pervasive" and should, in the exercise of reasonable care, have been discovered by management-level employees. *Id*. Here, it is undisputed that Ms. Dunlap reported the sexual harassment by Mr. Garcia, Mr. Bidishi, and Mr. Burkey to Mr. Albertson, a program manager. Docket No. 34-1 at 14 (Dunlap Dep. 64:9-20); *id*. (Dunlap Dep. 61:15-22). Pursuant to the employee handbook, Mr. Albertson is an employee authorized to receive and respond to complaints of sexual harassment. *Adler*, 144 F.3d at 673. Because Mr. Albertson is a designated person who can handle claims of harassment, the Court finds that Spec Pro knew or should have known about Ms. Dunlap's complaints of sexual harassment.

With regard to the second element, an employer's response is adequate if it takes remedial and preventative measures that are "reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676. Reasonably calculated responses include a prompt investigation, proactive solicitation of complaints, employee transfers, or warnings to offending employees. *Id*. Here, it is undisputed that Mr. Albertson took no

action to investigate Ms. Dunlap's claims of harassment.  Because Mr. Albertson knew of the alleged sexual harassment and responded indifferently, Ms. Dunlap has satisfied the second prong of this test.  *Id*.

The Court finds that Ms. Dunlap has sufficiently raised a genuine issue of fact about whether Spec Pro can be held liable for the conduct of its employees under a negligence theory.  Accordingly, Spec Pro is not entitled to summary judgment on plaintiff's negligence claim.

### 2.  *Vicarious Liability*

An employer may be vicariously liable "for actionable sexual harassment perpetrated by a supervisor with immediate (or successively higher) authority over the victimized employee in two situations."  *Helm*, 656 F.3d at 1285;  *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  First, an employer may be liable if a supervisor's sexually harassing conduct culminates in a tangible adverse employment action for the employee.  *Id*.  In this situation, the employer is strictly liable and it does not have an affirmative defense to vicarious liability.  *Pinkerton v. Colo. Dep't of Transp*., 563 F.3d 1052, 1059 (10th Cir. 2009).  Second, in the absence of a direct tangible adverse employment action, the employer is liable for a severe and pervasive hostile work environment unless it can prove what is known as the *Faragher/Ellerth* defense by a preponderance of the evidence.  *Helm*, 656 F.3d at 1285.  To establish the *Faragher/Ellerth* defense, an employer must come forward with evidence: (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing

behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.  *Id*.

Ms. Dunlap argues that Spec Pro is strictly liable because the actions of Mr. Weis and Mr. DeYoung culminated in her termination.  Docket No. 34 at 11.  In addition, Ms. Dunlap contends that Spec Pro is not entitled to the *Faragher/Ellerth* defense because its policies are not effective.  *Id*. at 10-12.

### a.  Whether Mr. Weis and Mr. DeYoung's Harassment Culminated in Ms. Dunlap's Termination

Ms. Dunlap argues that strict liability applies because Spec Pro terminated her employment as a result of Mr. Weis and Mr. DeYoung's sexual harassment.  Docket No. 34 at 11.

In order to show that her supervisors' actions culminated in her termination, Ms. Dunlap must "establish a strong causal nexus between the supervisor's harassment and the tangible employment action."  *Helm*, 656 F.3d at 1287.  Here, Ms. Dunlap offers no evidence that connects the actions of Mr. Weis and Mr. DeYoung to her termination.  The evidence on summary judgment is that Ms. Dunlap's non work-related automobile accident prevented her from performing her job functions.  She was placed on short-term disability leave until March 2009, when those benefits were exhausted.  In April 2009, Ms. Dunlap's doctor conditioned her return to work upon a weight bearing restriction.  The restriction prevented Ms. Dunlap from performing the essential functions of her position.  As a result of the restriction, Spec Pro transitioned her to long-term disability status and transferred her to inactive status effective May 1, 2009.  Docket No. 21-1 at 3, ¶¶ 16, 18.  Ms. Dunlap presents no evidence to rebut Spec Pro's

claim that it "handled Ms. Dunlap's . . . benefits consistently with its employees in similar situations." *Id*. at ¶ 21.  Without evidence of a strong causal connection between her termination and the conduct of Mr. Weis and Mr. DeYoung, no reasonable jury could conclude that her supervisors' conduct culminated in her termination. *Pinkerton*, 563 F.3d at 1059.  Therefore, Spec Pro is entitled to assert the *Faragher/Ellerth* affirmative defense to Ms. Dunlap's claim of sexual harassment. *Helm*, 656 F.3d at 1287.

### b.  Application of the Faragher/Ellerth Defense

As noted above, to establish the *Faragher/Ellerth* defense, an employer must come forward with evidence: (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.  *Helm*, 656 F.3d at 1287.

### i.   Whether Spec Pro Exercised Reasonable Care to Prevent and Correct Promptly any Sexually Harassing Behavior

The first element of the *Faragher/Ellerth* defense requires that an employer exercise reasonable care to: (1) prevent sexual harassment and (2) correct promptly any sexual harassment that has occurred.  *Pinkerton*, 563 F.3d at 1062.

The Tenth Circuit has held that an employer can satisfy the prevention requirement by showing the existence of a valid sexual harassment policy.  *Helm*, 656 F.3d at 1288.  Here, Spec Pro implemented a sexual harassment policy that (1) provides a clear explanation of prohibited sexually harassing conduct, (2) identifies

multiple avenues for employees to raise complaints, (3) protects employees from retaliation, (4) requires Spec Pro to investigate all reports of sexual harassment, (5) gives reasonable assurances of confidentiality, and (6) indicates that Spec Pro will take immediate and appropriate corrective action. Docket No. 21-5 at 10-12 (SPEC 00086-00088). Spec Pro distributes this sexual harassment policy to its employees through the employee handbook, and Ms. Dunlap testified that she read the sexual harassment policy. Docket No. 21-2 at 22 (Dunlap Dep. 76:1-5). Based on the foregoing, the Court finds that Spec Pro has a facially effective anti-harassment policy sufficient to satisfy the prevention requirement.[5] *See Anderson v. Wintco, Inc.*, 314 F. App'x 135, 139 (10th Cir. 2009).

The Tenth Circuit has found that an employer can satisfy the correction element by showing that it acted promptly to investigate or address a complaint of harassment. *Helm*, 656 F.3d at 1290. The "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* (citing *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001)).

---

[5]The EEOC provides that a facially adequate sexual harassment policy should contain, at a minimum, the following elements: (1) a clear explanation of prohibited conduct; (2) assurance that employees who make complaints of harassment will be protected against retaliation; (3) a clearly described complaint process that provides accessible avenues of complaint; (4) assurance that the employer will protect the confidentiality of harassment complaints; (5) a complaint process that provides a prompt and impartial investigation; and (6) assurance that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred. *See* EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, § V.C.1, 1999 WL 33305874, at *9 (June 18, 1999) (listing elements of an effective anti-harassment policy and complaint procedure).

The record shows several instances where Spec Pro took immediate action when informed of allegations of sexual harassment.  For example, in 2005 Spec Pro terminated an employee who Ms. Dunlap accused of inappropriate physical contact. The employee's termination occurred within two weeks of her complaint.  Docket No. 21-2 at 12-13 (Dunlap Dep. 44:21-25, 45:16-19).  In addition, after Ms. Dunlap informed Ms. Vargas of sexual harassment in April 2009, Spec Pro sent a team to the mail center at Peterson Air Force Base in May 2009.  Docket No. 21-6 at 2, ¶ 8.  The investigation resulted in Mr. DeYoung and Mr. Weis receiving letters of reprimand.  In addition, Mr. Oakes conducted a sexual harassment training session for Spec Pro employees and managers at Peterson Air Force Base.  Docket No. 21-1 at 4, ¶ 26.  Based on the foregoing, the Court finds that Spec Pro's prompt action to correct at least two complaints of sexual harassment satisfies the correction requirement.  *Helm*, 656 F.3d at 1291.

Because Spec Pro provided evidence that it takes prompt action to prevent and correct claims of sexual harassment of which it is aware, the Court must next determine whether it was unreasonable for Ms. Dunlap to raise her complaints with Mr. Albertson even though he was unresponsive.

### ii.   Whether Ms. Dunlap Failed to take Advantage of Preventive or Corrective Opportunities or to Avoid Harm Otherwise

Under this element, Spec Pro must demonstrate that Ms. Dunlap unreasonably failed to take advantage of its policies.  *Helm*, 656 F.3d at 1291.  Spec Pro argues that, even assuming Ms. Dunlap raised her complaints with Mr. Albertson, she did not

reasonably avail herself of its sexual harassment policy because she did not complain to a director or to HR once it became clear that Mr. Albertson would not take corrective action.  Docket No. 21 at 15-16.  Spec Pro contends that, given the availability of alternative venues to raise her complaints, it was unreasonable for Ms. Dunlap to continue to raise her concerns with Mr. Albertson.  *Id*. at 16.  In response, Ms. Dunlap claims that it was reasonable for her not to raise her complaints with other program managers and directors because of Mr. Albertson's failure to act.  Docket No. 34 at 10-11.  She argues that she was not guaranteed an effective response and her employment was threatened by Mr. Weis and Mr. DeYoung.  *Id*.

The Court finds that whether it was unreasonable for Ms. Dunlap not to raise her complaints of sexual harassment with other program managers or directors at Spec Pro raises a disputed issue of fact.  Given that her immediate supervisors participated in the harassing behavior, Ms. Dunlap notified an alternative management representative under the Open Door Policy.  Moreover, Mr. Albertson allegedly lost Ms. Dunlap's book that contained the dates of the sexual harassment incidents, making it uncertain whether raising the issue with another program manager would lead to tangible results.  Spec Pro cites no cases that obligates an employee to exhaust every option identified in the employer's handbook, especially when the handbook does not require exhaustion.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104-05 (2d Cir. 2010) (denying a company's *Faragher/Ellerth* defense and noting that victims of sexual harassment are not required to "go from manager to manager until they find someone who will address their complaints").  Because the reasonableness of Ms. Dunlap's actions raises a disputed issue of fact, the Court finds that Spec Pro is not entitled to

summary judgment on its *Faragher/Ellerth* affirmative defense.  *Pinkerton*, 563 F.3d at 1064.

### C.   Retaliation

Title VII forbids retaliation against an employee because she has opposed any practice made unlawful by Title VII or "participated . . . in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Where there is no direct evidence of retaliation, as is the case here, the burden-shifting analysis established in *McDonnell Douglas  Corp. v. Green*, 411 U.S. 792, 802-04 (1973) applies.  See *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (a plaintiff can prove retaliation "by relying on the three-part McDonnell Douglas framework") (internal quotation marks omitted).  Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, whereupon the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination, and then plaintiff must show that the employer's stated reason is pretextual. *Id*.

To establish a prima facie case of discrimination, Ms. Dunlap must prove that (1) she engaged in protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there is a causal connection between the protected activity and the adverse employment action.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  The Court finds that Ms. Dunlap has established a prima facie case of retaliation.  First, she engaged in protected activity when she told Ms. Vargas about sexual harassment in April 2009.

Second, her termination qualifies as an adverse employment action. *Id.* (noting that "materially adverse" action is one that would dissuade an employee from making a complaint).  Third, she was terminated less than two months after raising a complaint of sexual harassment. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that a period of six weeks gives rise to a rebuttable inference of a causal connection); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (holding that a period of up to two to three months demonstrated causation for the purposes of establishing a prima facie case under Title VII).  The burden therefore shifts to Spec Pro to articulate a legitimate, nondiscriminatory reason for Ms. Dunlap's termination.

Spec Pro argues that it terminated Ms. Dunlap's employment because she exhausted her short-term disability benefits and could not perform essential work duties upon her return due to her weight bearing restrictions.  Docket No. 21 at 17-18.  Spec Pro further argues that Ms. Dunlap cannot establish causation because she did not re-apply for a position once her restrictions were removed.  The Court finds that Spec Pro has identified a legitimate nondiscriminatory reason for termination, namely, Ms. Dunlap's inability to perform the essential functions of her position because of the weight bearing restriction.

To show pretext, Ms. Dunlap must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo*, 452 F.3d at 1203.  Ms. Dunlap claims that

21

Spec Pro's reason for termination was pretextual because four other Spec Pro employees who did not complain of sexual harassment were accommodated for their long-term injuries.  Docket No. 34 at 12-13.  Specifically, Ms. Dunlap claims that Mr. Patterson, Mr. Garcia, Ms. Clayton, and Jeff Caraway were not terminated even though they had long-term injuries and work restrictions.  This evidence, however, is unpersuasive.

A plaintiff may show pretext by providing evidence that she was treated differently from other similarly situated employees.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).  Individuals are considered "similarly situated" when they deal with the same supervisor and are subjected to the same standards governing performance.  *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997).  To show disparate treatment, a plaintiff must show that she was similarly situated to her comparators in "all relevant respects," and courts traditionally "compare the relevant employment circumstances, such as work history and company policies" to determine whether employees are similarly situated.  *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (citation omitted).  Here, Ms. Dunlap does not sufficiently establish that she is similarly situated to Mr. Patterson, Mr. Garcia, Ms. Clayton, and Mr. Caraway.

First, Ms. Dunlap does not establish whether these employees exhausted their short-term disability benefits prior to the accommodation.  Ms. Dunlap testified that she did not know of any individuals who were accommodated after they exhausted their sick leave allotment.  Docket No. 34-1 at 10 (Dunlap Dep. 153:2-4).  Second, she does not establish whether these employees were placed on inactive status and later re-applied

22

with Spec Pro.  Third, she fails to establish that these employees suffered from non work-related injuries.[6]  *See McGowan*, 472 F.3d at 745.  Accordingly, Ms. Dunlap fails to provide enough evidence to show that she is similarly situated to these employees.

Given that Ms. Dunlap does not establish that Spec Pro treated her any differently than other similarly situated employees, she does not show that Spec Pro's reason for her termination was pretextual.  Instead, the undisputed evidence establishes that she was given the full extent of her short-term disability benefits, Spec Pro transitioned her to long-term disability because of the weight bearing restrictions, and she did not re-apply for a position with Spec Pro.  Docket No. 21-1 at 3, ¶ 22. Based on the foregoing, Ms. Dunlap fails to raise any genuine inconsistencies, incoherencies, or contradictions with Spec Pro's legitimate non-discriminatory reason for termination and no reasonable jury could conclude that Ms. Dunlap's termination was retaliatory.  *Argo*, 452 F.3d at 1204.  Accordingly, Spec Pro is entitled to summary judgment on Ms. Dunlap's retaliation claim.

### D.  Punitive Damages

Punitive damages may be awarded under Title VII.  *See* 42 U.S.C. § 1981a(b)(1).  To recover punitive damages, a plaintiff must show that the employer engaged in discriminatory practices with malice or with reckless indifference to the employee's federally protected rights.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007).  Malice and reckless indifference can be shown by evidence that the

---

[6]It is undisputed that Mr. Patterson and Ms. Clayton both suffered from work-related injuries.  Docket No. 35-4 at 2-3 (Dunlap Dep. 148:18-20, 149:19-23).  She does not establish whether Mr. Garcia and Mr. Patterson suffered from work-related injuries. *Id.* at 3-5 (149:24-151:2).

employer "acted in the face of a perceived risk that its actions would violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36 (1999). However, an employer may not be vicariously liable for punitive damages if a managerial employee's actions were contrary to the employer's good-faith effort to comply with Title VII. *Id.* at 545-46; *see also Deters v. Equifax Credit Information Servs.*, 202 F.3d 1262, 1271 (10th Cir. 2000). To avail itself of the good-faith compliance standard, an employer must: (1) adopt anti-discrimination policies; (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and (3) make good faith efforts to enforce an anti-discrimination policy. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000). Because the good-faith compliance standard focuses on the actions of the employer, an employee is not required to follow the employer's procedures for reporting harassment or retaliation in order to receive punitive damages. *McInnis*, 458 F.3d at 1140. Thus, even if an employer "adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." *Cadena*, 224 F.3d at 1210.

Because there are disputed facts that underlie Ms. Dunlap's negligence claim, Spec Pro's *Faragher/Ellerth* affirmative defense, and whether Spec Pro satisfied the good-faith compliance standard, the Court finds that Spec Pro is not entitled to

summary judgment on Ms. Dunlap's request for punitive damages.  *McInnis*, 458 F.3d at 1139-40.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 21] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that summary judgment shall enter in favor of defendant Spec Pro, Inc. and against plaintiff Tonya Dunlap on her claim of retaliation.

DATED April 5, 2013.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge